# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 1481 | DATE | 9/6/2000 |
| CASE TITLE | CRAWFORD vs. APFEL | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____.  Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Pursuant to Memorandum Opinion and Order entered this day, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted. This action is dismissed in its entirety. All other pending motions are moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

SEP 0 7 2000
date docketed

EO-7
FILED FOR DOCKETING
00 SEP -7 AM 7: 58

docketing deputy initials
9/6/2000
date mailed notice

JS courtroom deputy's initials

JS
mailing deputy initials

Date/time received in central Clerk's Office

Document Number

16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
SEP 0 7 2000

| | |
|---|---|
| DOREEN CRAWFORD, | ) |
| | ) |
| SSN: 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 | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     No. 00 CV 1481 |
| | ) |
| KENNETH S. APFEL, | ) |
| COMMISSIONER OF SOCIAL SECURITY | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiff Doreen Crawford seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner"), which found that she was not entitled to disability insurance benefits because she was not disabled. See 42 U.S.C. § § 416(i), 423(d). The parties have filed cross motions for summary judgment. For the following reasons, plaintiff's motion for summary judgment is DENIED. Defendant's motion for summary judgment is GRANTED.

## PROCEDURAL BACKGROUND

Plaintiff Doreen Crawford filed an application for disability insurance benefits with the Social Security Administration ("SSA") on October 5, 1994. (R. 26-29.) She alleged an onset of disability on July 9, 1993. SSA denied the application initially and upon reconsideration. (R. 32, 41.) Plaintiff requested a hearing on April 12, 1995, and a hearing was held before Administrative

1

Law Judge ("ALJ") Shinizky on February 6, 1997. (R. 220-84.) On May 20, 1998, the ALJ denied plaintiff's application. (R. 12-26.) Plaintiff filed a request for review on February 16, 2000. (R. 216.) The Appeals Council denied plaintiff's request on February 16, 2000. (R. 9-11.)

## FACTUAL BACKGROUND

### I.   Testimony of Plaintiff

Plaintiff was 42 years old at the time of the ALJ's decision. (R. 227.) She has a high school diploma, attended two years of college, and has two children ages 21 and 22. (R. 228, 231, 233.) She last worked as mental health technician, a job she held for almost 15 years. (R. 232.) The job required her to clean the residences, wash, mop, help patients get dressed, lift them into wheelchairs, and other such duties. (R. 233.)

Plaintiff testified that she was disabled by constant back pain which radiated into her leg. (R. 234.) The toes on her right foot become numb (R. 234) and her lower back pain is constant (R. 238). Plaintiff testified that the pain was excruciating "maybe" three times a week. (R. 241.) The pain can last all day, but she could take medication when she had severe pain. (R. 241-44.) The medications do not relieve the pain, but do help her to sleep, so that she does not experience the pain. (R. 243.) It takes about a half hour before she goes to sleep after taking the medications and she might sleep for three hours. (R. 243.)

Plaintiff testified that she could sit for thirty minutes, walk four blocks, and stand for 15 minutes, but that after performing each of those activities, she needed to lie down to relieve back pain. (R. 247-48, 251.) Plaintiff is more comfortable lying down than sitting down, and can only sit for twenty to thirty minutes. (R. 243, 247.) Plaintiff testified that she has to lie down for about five hours a day between the time she wakes up and dinner time. (R. 257.) Plaintiff wears a back

2

brace which was recommended to her by a doctor. (R. 255.) She has difficulty with bending and squatting. (R. 256.)

Plaintiff initially testified that no one lived with her, but then changed her testimony and said that she lived in a house with her daughter, son, and four-year-old grandchild. (R. 230-31.) Plaintiff also later admitted that her fiancé also lived with her. (R. 230-31, 248.) Plaintiff testified that no one shared the household expenses with her, but then admitted that her daughter paid for food and that her fiancé also contributed. (R. 249.) Plaintiff testified that she was able to care for her personal needs, watch television, grocery shop with assistance, and made beds. (R. 247-48, 251.)

Plaintiff complained of seizures which occurred a couple of times a month while she was sleeping and caused fatigue the next morning. (R. 257-58.) Plaintiff has suffered from these types of seizures since she was thirteen, and was placed on medication as a child. Plaintiff testified that she also has episodes several times a week which cause her to stare and lose focus for no longer than five minutes. (R. 260.)

In her request for a hearing, plaintiff stated that if she stood too long, it feels like someone is pressing on her lower back causing pain, and then she has to lie down. (R. 44.) In her disability report, plaintiff reported that she used to bowl, fish, go to health clubs, walk, and ride her bicycle. (R. 51.) In her Reconsideration Disability Report, plaintiff stated that when she sits or walks for too long, "a pain in my back cause me to walk curve over." She was once a very active bowler, biker, and aerobics instructor. (R. 56.) Now she just stays around the house, sitting, and when sitting bothers her she has to lie down due to pain. (R. 38.)

II.  Medical Evidence

A.  Medical Records

On November 2, 1994, Dr. Ricardo Gonzalez, Jr., M.D., a treating physician, completed a form stating that he had diagnosed plaintiff with low back syndrom. (R. 67.) Dr. Gonzalez stated that plaintiff had a normal range of motion in her spine, normal reflexes, no atrophy, no muscle spasm, showed no evidence of nerve root compression, and could walk without assistance. (R. 67-67.)

On June 21, 1994, Dr. Leonard Smith performed a consultive examination of plaintiff and sent a letter to the State Retirement System on behalf of plaintiff. (R. 63.) Plaintiff complained of lower back pain with occasional tingling in the left leg, which sometimes lasted two hours. (R. 63.) She complained that lifting and walking for long periods of time aggravated the pain. (R. 63.) X-rays of her lumbar spine showed degenerative disc disease at L5-S1, minimal scoliosis, and minor hypertrophic changes in the lower lumbar vertebrae. (R. 63.) On examination, Dr. Smith noted plaintiff's subjective complaints of tenderness and some minor limitations in the range the motion of her lower back. (R. 63-64.) The doctor also found that plaintiff had a normal straight leg raising test (a test for radiculopathy or nerve root disease), a normal gait, normal reflexes, and normal sensation.  (R. 64.) Dr. Smith concluded that plaintiff had evidence of degenerative disc disease at L5-S1, but had made a satisfactory recovery and might benefit from continued use of NSAIDs as needed. (R. 64.) He advised plaintiff to lose weight and to exercise. (R. 64.)

Dr. Edwin McDonald was plaintiff's treating chiropractor. He testified on October 31, 1994 that he had treated plaintiff for one year and that plaintiff had been unable to work at her job, which required her to lift patients. (R. 65-66.) Plaintiff's complaints included severe low back pain which

extended to the legs. The doctor noted bilateral lumboscral tenderness and paravertebral muscle spasms going into the thighs. (R. 65.) He diagnosed severe degenerative arthritis of the lumbar spine and bilateral lumboscral spinal manipulations. The prognosis was guarded due to osteoarthritis in the back. (R. 65.) Treatment included pelvic traction, diathermy, ultrasound, and spinal manipulations. Dr. McDonald opined that plaintiff "will probably experience pain and discomfort for an extended period of time." (R. 66.)

On December 10, 1994, a computed tomography scan (CT scan) of plaintiff's lumbar spine showed severe degenerative changes at L5-S1, suggesting discitis.

Dr. B. Murthy, M.D. examined plaintiff at the request of the administration. She prepared a report in December 1994. Dr. Murthy noted plaintiff's complaints of severe, sharp back pain which radiated down both legs and increased with bending, stooping and lifting. (R. 70.) Plaintiff stated she could stand for ½ hour, sit for ½ hour, walk for two blocks, and carry/lift 20 pounds. Plaintiff's medication was 600 milligrams of Ibuprofen. (R. 70.) Upon examination, Dr. Murthy noted that plaintiff could get off and on the examination table without difficulty and could walk on her heels and toes. (R. 71.) Dr. Murthy found straight leg rasing test was 50 degrees on the right and 40 degrees on the left. (R. 71.) There was a "vague" tenderness over the L2-3-4 area. Ventral movement was to 60 degrees, with dorsal movement to 10 degrees. (R. 71.) The doctor concluded that the examination showed moderate limitation of motion of the lumboscral spine with an impression of severe degenerative joint disease. (R. 72.) X-rays showed severe degenerative changes at L5 and S1 and possible evidence of dicitis. (R. 73.) Plaintiff had normal neurological findings, including normal sensation, reflexes, and strength. (R. 71.)

On December 27, 1994, a state agency physician reviewed the medical evidence and

concluded that plaintiff could perform medium work. (R. 76, 82.)

X-rays taken on February 19, 1995 established straightening of the normal lordotic curvature, most probably secondary to muscle spasm, and narrowing of the disc space at L5-S1 with hypertrophic ostephytes. (R. 148.) The impression was "findings suggestive of muscle spasm and degenerative and arthritic changes in the lower lumbar spine." (R. 148.)

Also in February 1995, plaintiff's treating orthopedic specialist, Dr. Schiappa, examined plaintiff for complaints of back pain. (R. 158.) Dr. Schiappa said that plaintiff's x-rays showed a straightening of the lumbar spine and osteoarthritis denigration with spurring. (R. 158.) Plaintiff's straight leg raising test was negative, and she had normal reflexes, sensation, and circulation. (R. 158.) The doctor advised plaintiff that her condition was secondary to arthritis, which would be with her for the rest of her life. (R. 158.) He recommended against surgery, but advised plaintiff to take Naprosyn and to undergo physical therapy. (R. 158.)

On May 15, 1995, Dr. Schiappa examined plaintiff again and found that she had a negative straight leg raising test, normal reflexes, and no sensory deficits. (R. 155.) Plaintiff reported that she took Naprosyn only when needed, and indicated that it provided some relief of her symptoms. (R. 155.) Dr. Schiappa advised plaintiff to rest and to avoid heavy lifting. (R. 155.) The doctor told plaintiff that she would never be pain-free, and that she would have "some good days but mostly bad days." (R. 155.)

On May 18, 1995, a neurologist examined plaintiff and diagnosed lumbar radiculopathy. (R. 147, 154.) The neurologist recommended electromyographic (EMG) studies, physical therapy, and Naprosyn. (R. 147.)

In August 15, 1995, Dr. Schiappa diagnosed plaintiff with low back pain, noting that the

EMG showed a right sided L5 radiculopathy. The doctor also noted that plaintiff had normal sensation and reflexes, and that she reported that she "was doing much better." (R. 153, 159-69, 172.) X-rays revealed arthritic denigration. Because plaintiff indicated that the Naprosyn was not helping, the doctor switched her to NSAID. (R. 153.)

Again in September 1995, plaintiff complained of low back pain. (R. 152.) Once again Dr. Schiappa informed her that the pathology would not go away, and that the medication was "simply to decrease the symptoms." (R. 152.) Dr. Schiappa diagnosed plaintiff with osteoarthritic derangement at L5, S1. (R. 152.) The doctor also stated that plaintiff's examination findings were normal. (R. 152.)

In May 1996, plaintiff complained to Dr. Schiappa of a flare up of the low back with severe pain. Her right big toe was numb and she experienced tingling in her face. She noted a history of seizures. Dr. Schiappa's assessment was "rule out" seizures and low back pain. He prescribed Tylenol #3 and Naprosyn. (R. 149.)

In March 1997, plaintiff experienced a flare up of seizures and back pain secondary to radiculopathy. (R. 175-75.) She had experienced three seizures in February. Dr. Schiappa's assessment was seizures, and he prescribed Dilantin. An EEG from February 1997 was normal and showed no abnormalities to confirm a seizure disorder. (R. 175.)

On August 28, 1997, plaintiff's treating physician, Dr. Gonzales, said that plaintiff could lift up to twenty pounds occasionally and sit and stand up to two hours each in a eight-hour day. (R. 167-69.) He also said that she could not push or pull due to arthritic pain in her lower back. (R. 168.) The doctor placed no limitations on plaintiff's ability to reach or handle objects. (R. 168.)

At the request of the ALJ, Dr. Shlicher, M.D., testified as a medical expert at the hearing on

7

February 6, 1997. The doctor testified that it is "extremely important" to determine if plaintiff's seizures are "obecsonian" or epileptic, so she should see a neurologist. (R. 264.) The doctor also stated that plaintiff has severe radiculopathy and should undergo an "excellent orthopedic evaluation." (R. 265, 267, 268.) The doctor stated that, given the evidence before him, he had concluded only that plaintiff had seizures and severe radiculopathy both of unknown causes, and that her impairments did not meet the listings. (R. 267-68.) Dr. Shlichter opined that plaintiff could perform "apparently a limited sedentary amount of work," but couldn't testify as to how long she could, for example, sit and do work. (R. 269.) The radiculopathy and degenerative arthritis could prevent plaintiff from sitting for prolonged periods of time without increasing pain. (R. 269-70.) The impairments could interfere with sustaining any position for a long time, including lying down, siting, and walking. (R. 270.) Dr. Schiappa testified that drowsiness is a possible side effect of some medications taken by plaintiff. (R. 270.) The doctor did not state that plaintiff's particular medications, Daypro, Naprosyn, and Motrin, were likely to cause drowsiness. (R. 144, 270.)

At the request of the ALJ, Dr. Girzadas performed an orthopedic consultive examination on September 18, 1997. (R. 180.) Plaintiff stated that if she sits for greater than 30 minutes or stands for greater than 15 minutes, she must lie down due to severe pain, and that she had pain in the right and left shoulders, and had been recently diagnosed with tendinitis of the shoulders. (R. 180.) The doctor noted that "part of the workup in the past [was an] EMG, she states, which showed a pinched nerve, but could not be more specific." Plaintiff noted Relefen for pain and Dilantin for sleep seizures. (R. 180.) On examination, Dr. Girzadas found that plaintiff had a full range of motion in her cervical spine, shoulders, elbows, hands, and wrists. (R. 181.) Dr. Girzadas found no evidence of muscle spasm in the back, but plaintiff did have limited range of motion due to complaints of

8

pain. (R. 181.) Plaintiff's straight leg raising test was negative to seventy degrees. She had normal strength and sensation. Forward flexion was limited to 45 degrees, extension to 10 degrees, limited by pain. Plaintiff was reluctant to bend to either side and could do so only to 10 degrees when she tried. (R. 180.) The doctor diagnosed probable degenerative arthritis of the lumbar spine, with chronic low back strain and mild bilateral radiculopathy, and, per history, bilateral tendinitis of the shoulders and sleep disorder. (R. 181.)

B.      Medical Opinions

1.      Dr. Ricardo Gonzalez

The ALJ requested Dr. Ricardo Gonzalez, plaintiff's treating physician, to prepare an assessment of plaintiff's ability to do work-related activities. Dr. Gonzales noted that he had treated plaintiff from August 15, 1994 through March 28, 1997. He opined that lifting and carrying were limited to 15-20 pounds occasionally. (R. 167.) Standing and walking were limited to one to two hours in an eight hour work day. Plaintiff should never climb, balance, crouch, or crawl, and could occasionally kneel and stoop. She could not push or pull due to arthritic pain. (R. 168.)

2.      Dr. Girzadas

Based on his consulting examination, Dr. Girzadas, an orthopedic specialist, prepared an assessment of plaintiff's work capabilities. He concluded that plaintiff could lift 10 pounds frequently and 25 pounds occasionally. (R. 185.) She could stand or walk for an hour at a time for up to six hours in an eight hour day. She had no limitations in sitting. (R. 186.) Reaching was somewhat restricted due to tendinitis in her shoulders. (R. 187.) Pushing and pulling were also affected. (R. 187.) She could occasionally climb, balance, crouch, kneel, and crawl. (R. 187.) The doctor noted: "All of the above limitations are caused because of the patient's chronic low back

9

strain and tendinitis of her shoulders." (R. 187.)

   3.   Dr. Jose Gonzalez

Dr. Jose Gonzalez never examined plaintiff, but reviewed her file at the request of the Administration on December 27, 1994. His opinion was confirmed by Dr. Patey on March 9, 1995. Dr. Jose Gonzalez opined that plaintiff could stand/walk for six hours in an eight hour work day. Pushing and pulling were unlimited. Lifting was decreased due to low back pain, decreased range of motion of the spine, and x-ray evidence of degenerative osteoarthritis of the lumbar spine. (R. 76.) He concluded that plaintiff could climb occasionally and stoop and crawl frequently. (R. 77.) Finally, the doctor noted no evidence of radiculopathy, but noted that plaintiff "still complains of sharp pain in the lumboscral area -- can walk two blocks without assistive device." (R. 82.)

   C.   Vocational Expert Clifford Brady

At the request of the ALJ, Clifford Brady testified as a vocational expert at the hearing. He classified plaintiff's past work as a mental health technician as in the heavy exertional category. The ALJ asked the vocational expert a number of hypothetical questions. First, assuming a hypothetical claimant with the physical capacity to perform sedentary work, requiring a job in which she could stand up or sit down at her discretion to relieve pain, with limitations in bending and stooping, and could walk for three or four blocks, what jobs were available. (R. 272-72.) The vocational expert said that this individual could perform one of more than 15,000 jobs, such as cashier (3,600) positions), telemarketer (5,500 positions), assembler (4,000 positions), and security guard (2,100 positions). (R. 273.) The individual could perform these jobs even if she had seizures several times a week that caused her to space out for a few minutes. (R. 280.) Assuming further that the hypothetical claimant was required to take medications which caused "feelings of sleepiness and

drowsiness," the vocational expert opined that if the claimant's drowsiness caused her to have to lie down three to four times per week, it would eliminate all of the positions he mentioned. If the claimant could only perform half of the activities because of drowsiness, it would affect all the jobs mentioned. However, if the individual could keep up a reasonable pace while being drowsy, it would not affect the claimant's ability to perform those jobs. (R. 274.) Assuming the credibility of plaintiff's testimony, all jobs mentioned would be eliminated. (R. 274-75.) If the hypothetical claimant, after sitting or standing for 30 minutes, was required to lie down for "a period of time," this too would eliminate all positions. (R. 276.)

III.    Decision of the ALJ

The ALJ made the following formal findings. The medical evidence establishes impairments of degenerative arthritis of the lumbar spine, chronic low back strain with evidence of bilateral radiculopathy, bilateral tendinitis of the shoulders, and possible sleep disorder. (R. 24, #3.) The ALJ found that the combined effects of these impairments did not meet or equal a listed impairment. (R. 20, 24, #3.) The ALJ found that plaintiff's impairments caused limitations, but did not prevent plaintiff form performing light, sedentary work that permitted her to sit or stand as needed and did not require more than limited stooping or bending. The ALJ further found that plaintiff's allegations of debilitation shoulder tendinitis, seizures, and radiculopathy precluding any significant walking, siting, or standing were not borne out by the evidence and were out of proportion to the limitations observed clinically by the consultative examiners. (R. 24, #4.) Plaintiff's residual function capacity is for mixed range of light and sedentary work, with an option to sit or stand as needed and not requiring more than limited stooping, bending, or other such lumbar focal activities. (R. 24, #5.) Plaintiff is unable to perform her past relevant work. (R. 24, #6). However, there are a significant

11

number of jobs which she could perform, including cashier, telemarketer, assembler, and security. (R. 24, #6; R at 25, #12.)

In the body of his decision, the ALJ provided his rationale as follows. The findings and functional assessment of Dr. Girzadas were "not significantly incongruous" with the findings of Dr. Murthy, Dr. Smith, Dr. Schiappa, or Dr. Jose Gonzales, in terms of symptomatic presentation and clinical musculoskeletal limitations. (R. 20.) Dr. Ricardo Gonzales' medical assessment found limitations not found by Drs. Girzadas, Smith or Jose Gonzales: "While a number of these findings indicate limitations which exceed, in degree and kind, those found by other physicians of record; they generally comport and are consistent with findings of these other doctors." (R. 20.) Because plaintiff's bilateral shoulder tendinitis was not discussed by the treating physician, Dr. Gonzalez, in his functional assessment, the ALJ concluded that these impairments are not severe. (R. 20.) The ALJ found that plaintiff's complaints of debilitating pain were not supported by the objective record and that they were not fully credible. The ALJ found plaintiff's complaints to be "significantly embellished and exaggerated." (R. 21-22.) In a letter to the ALJ, plaintiff's counsel had suggested that Dr. Girzadas did not review the objective medical evidence concerning plaintiff's impairments prior to his evaluation and assessment. The ALJ responded by stating that a packet of information was forwarded to the state office in charge of setting up the consultative evaluation, and the information was therefore available to Dr. Girzadas. (R. 22.)

The ALJ also found that Dr. Gonzales' conclusions, as a treating physician, were consistent "with the general exertional levels found by Dr. Girzadas, although differing with regard to specific limitations or restrictions." The ALJ found that Dr. Girzadas' findings are also consistent with the examinations of plaintiff's treating orthopedic specialist, Dr. Schiappa, wherein Dr. Schiappa noted

12

"more than a severe, but not functionally disabling impairment" because his examinations were generally within normal limits. (R. 22.) Although plaintiff testified to frequent drowsiness caused by her medications, the job informational form (Ex. 35, p.5) did not list drowsiness as a side effect of mediation. Given the credible evidence and testimony, the ALJ found that plaintiff retains the capacity for a mixed light and sedentary range of work, with stand-sit option. Relying on the testimony of the vocational expert, the ALJ found that plaintiff could perform a significant number of jobs existing in the economy. (R. 23.)

## STANDARD OF REVIEW

The findings of the ALJ as to any fact, which constitute the findings of the Commissioner of Social Security where the Appeals Council denies review, are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Unlike findings of fact, conclusions of law are reviewed de novo. Dotson v. Shalala, 1 F.3d 571, 575 (7th Cir. 1993). The ALJ is not required to comment on every piece of evidence presented, but the ALJ's decision must be based on consideration of all the relevant evidence and the reasons for the conclusion must be stated in a manner sufficient to permit an informed review. Ray v. Bowen, 843 F.2d 998, 1002 (7th Cir. 1988). This court cannot reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ. Banuelos v. Apfel, 165 F.3d 1166 (7th Cir. 1999); Luna v. Shalala, 22 F.3d 687, 689 (7th Cir. 1994). The question, therefore, is not whether plaintiff is in fact disabled but rather whether the ALJ's findings were supported by substantial evidence. Books v. Chater, 91 F.3d 972, 977 (7th Cir. 1996). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). The court must consider both the evidence that supports, as well as the evidence that detracts

from, the Commissioner's decision in deciding whether or not substantial evidence supports the decision. Bauzo v. Bowen, 803 F.2d 917, 923 (7th Cir. 1986).

## ANALYSIS

A person is considered disabled under the Social Security Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In order to determine if a claimant is disabled, the ALJ conducts the following five-step inquiry: (1) is the claimant currently employed; (2) does the claimant have a severe impairment; (3) does the impairment meet or exceed one of the impairments listed in 20 C.F.R. § 404, subpart P, appendix 1; (4) can the claimant perform his or her former occupation; and (5) is the claimant unable to perform any work that exists in the national economy. 20 C.F.R. §§ 404.1520, 416.920.

Here, the ALJ found plaintiff not disabled at step 5 of the evaluation process, finding that although plaintiff could not perform her past work, she could perform other jobs in the national economy. Because plaintiff has shown an inability to perform past work (step four), the burden shifts to defendant to show that plaintiff is able to engage in some other type of gainful employment. Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995). Defendant can meet that burden by showing that plaintiff is capable of performing some other work that exists in significant numbers in the national economy, taking into consideration plaintiff's age, education, and work experience. Lee v. Sullivan, 988 F.2d 789, 792 (7th Cir. 1993).

## I.   Weighing of Medical Opinions

Plaintiff claims that the ALJ erred by failing to properly weigh the evidence presented by the

14

medical opinions according to 20 C.F.R. § 404.1527(d). Specifically, plaintiff claims that the ALJ did not accord proper weight to the opinion of her treating physician, Dr. Gonzalez, who stated that plaintiff could sit and stand for only two hours each in an eight hour day. The regulations provide the following guidance on the weight to be accorded to the opinions of treating sources:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2). When the Administration does not give the treating source's opinion controlling weight, it applies various other factors in determining the weight to give it, including whether a physician is a treating or examining physician, § 404.1527(d)(1); the length of the relationship, § 404.1527(d)(2)(i); the nature and extent of the treatment relationship, § 404.1527(d)(2)(ii); the physician's specialty, § 404.1527(d)(5); and the consistency and supportability of the physician's opinion, § 404.1527(d)(3)-(4).

When evaluating a conflict between the opinions of treating and consulting physicians, "the ALJ must take into account the treating physician's ability to observe the claimant over a longer period." Books v. Chater, 91 F.3d 972, 978 (7th Cir.1996) (citing Stephens v. Heckler, 766 F.2d 284 (7th Cir. 1985)). However, "while the treating physician's opinion is important, it is not the final word on a claimant's disability." Id. (citing Reynolds v. Bowen, 844 F.2d 451 (7th Cir. 1988)). The

Seventh Circuit has noted:

> The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability. The regular physician also may lack an appreciation of how one case compares with other related cases. A consulting physician may bring both impartiality and expertise.

Id. (quoting Stephens, 766 F.2d at 289). Thus, in the end, "it is up to the ALJ to decide which doctor to believe--the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases--subject only to the requirement that the ALJ's decision be supported by substantial evidence." Id. (citing Micus v. Bowen, 979 F.2d 602, 608 (7th Cir. 1992)).

This court finds no error in the ALJ's decision not to give controlling weight to the opinion of treating physician Dr. Gonzales that plaintiff could only sit and stand for four hours in an eight hour day. Under the regulations, an ALJ need only give a treating physician's opinion controlling weight if it is not inconsistent with the other evidence of the record. Here, Dr. Gonzales' opinion was inconsistent with the objective medical evidence and with the degree of limitation found by Drs. Schiappa and Girzadas and the state agency physicians. Moreover, the ALJ's decision to credit the other doctors over Dr. Gonzales is supported by substantial evidence.

The ALJ's decision to reject Dr. Gonzales' opinion that plaintiff could not sit or stand for more than two hours is supported by the opinions of other examining doctors. First, Dr. Schiappa, plaintiff's treating orthopedic physician, restricted plaintiff only from heavy lifting and advised her to "rest." (R. 155.) Dr. Girzadas, a consultative orthopedic specialist, found that plaintiff could walk or stand for an hour at a time, up to six hours a day, and sit without limitation. The state agency

16

physicians who reviewed the medical evidence, including the objective medical findings of Drs. Smith (R. 63-64), Gonzales (R. 67-68), and Murthy (R. 70-71) all also concluded that plaintiff could perform a range of medium work. (R. 76, 82.) Finally, the ALJ's decision was supported in part by Dr. Gonzales' own findings that plaintiff could lift twenty pounds and was able to perform some sitting and standing, although less than the other physicians.

The ALJ's decision was also supported by the objective medical evidence. X-Rays showed arthritic and degenerative changes in plaintiff's lumbar spine and an EMG showed some radiculopathy, but the physicians consistently found that plaintiff had no neurological deficits (R. 64, 67-68, 152-53, 187-58, 181) and had only moderate limitations of motion in her back. Plaintiff could walk normally, get on the examining table, and walk on her heels and toes. (R. 64, 67-68, 71.) The ALJ could reasonably conclude that the objective evidence undercut Dr. Gonzales' opinion of the degree of limitation caused by plaintiff's impairments.

Moreover, it is not clear how much weight Dr. Gonzales' opinion is entitled to by virtue of his being plaintiff's treating physician. The record is silent as to the number of times Dr. Gonzales treated plaintiff's back condition, and does not state that Dr. Gonzales specialized in orthopedic problems. Dr. Schiappa, on the other hand, is an orthopedic specialist, and also treated plaintiff for her back condition. Dr. Schiappa did state that plaintiff would always have pain, that she would have "mostly bad days," and that the abnormalities in the x-rays and EMG could prevent plaintiff from sustaining any position. However, Dr. Schiappa did not find that plaintiff's pain was disabling (R. 152-53, 155), and never said that plaintiff was disabled. (R. 269.) Rather, Dr Schiappa advised plaintiff to lose weight, exercise, and avoid lifting heavy weights. (R. 152, 155-58.) Furthermore, the ALJ considered the fact that plaintiff could not sit or stand for prolonged periods of time and

accommodated that limitation by restricting her to sedentary work that permitted her to change positions at her option.

Plaintiff contends that the ALJ erred in relying on the opinion of Dr. Girzadas because it appears that the doctor did not review plaintiff's medical records prior to examining plaintiff and rendering his opinion. Plaintiff raised this point to the ALJ, and the ALJ responded by stating that the records had been provided to Dr. Girzadas for his review. It does appear that Dr. Girzadas did not have the records of plaintiff's treating physicians or the objective evidence, including plaintiff's x-rays and EMG report, at the time he prepared his report. The regulations provide that in weighing the opinion of non-treating source, "[w]e will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources." However, this court does not believe that the ALJ erred in considering Dr. Girzadas' opinion even if Dr. Girzadas did not consider plaintiff's medical records. The x-rays showed degenerative arthritis, but Dr. Girzadas diagnosed "probable degenerative arthritis" even without the benefit of the x-ray, and the ALJ accepted that plaintiff suffered from severe arthritis in her back. The EMG report demonstrated right side L5 radiculopathy, but Dr. Schiappa had considered the EMG and did not find plaintiff to be disabled. Moreover, Dr. Schiappa did have all the medical evidence and opinions of other doctors available to him, and reached a conclusion similar to that reached by Dr. Girzadas nevertheless. As such, the ALJ had no reason to believe that Dr. Girzadas' opinion would have been substantially different had he considered plaintiff's medical records, and this court has no reason to disturb the ALJ's decision to consider Dr. Girzadas' report. However, even if this court were to conclude that the ALJ erred in considering Dr. Girzadas' report, the ALJ's decision would still be supported by substantial evidence because the ALJ did not rely solely on Dr.

Girzadas' findings and conclusions, but rather considered and weighed the findings and conclusions of numerous treating, examining, and reviewing sources, as well as the objective evidence.

In summary, this court finds no error in the ALJ's weighing of the treating and non-treating physicians' opinions. The ALJ was within his discretion to weigh the competing opinions, subject only to the limitation that his decision be supported by substantial evidence. See Books, 91 F.3d at 978. This court finds that the ALJ's decision was supported by substantial evidence, and therefore will not disturb his judgment.

II.    Combined Impact of Plaintiff's Limitations

Plaintiff argues that the ALJ failed to account for Dr. Girzadas' opinion that plaintiff suffered from shoulder tendinitis and for the limitations caused by that impairment, despite largely adopting the doctor's functional assessment of plaintiff, and that the ALJ failed to consider the combined impact of her severe and non-severe impairments. Plaintiff claims that the ALJ did not consider the limitations in pulling, pushing, and reaching found by Dr. Girzadas, and that there is no evidence in the record that a claimant with such limitations could perform the jobs mentioned by the ALJ. Plaintiff argues that in rejecting the evidence, the ALJ impermissibly substituted his own opinion for that of Dr. Girzadas. See Rohan v. Charter, 98 F.3d 966, 970 (7th Cir. 1996). Plaintiff further argues that an ALJ may not "pick and choose" from Dr. Girzadas' report, relying only upon that evidence with favors his opinion. Binion v. Charter, 108 F.3d 780, 788-89 (7th Cir. 1997). Finally, plaintiff argues that the ALJ did not consider the effect of the combination of her non-severe tendinitis and sleep disorder with her severe back arthritis and radiculopathy, as required by the regulations. See 20 C.F.R. § 404.1523 ("We will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of

sufficient severity."); see also SSR 96-3p ("The adjudicator must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'")

This court finds no error in the ALJ's decision to discount Dr. Girzadas' finding of shoulder tendinitis. The ALJ declined to restrict plaintiff's pushing, pulling, and reaching because her treatment record contains no discussion of shoulder tendinitis and there was no indication that the condition had lasted or was expected to last continuously for 12 months, as required to be considered disabling under social security. See 42 U.S.C. § 423(d). As such, the ALJ did not "substitute his own judgment" for that of the doctors, but rather found that the record did not support a finding of a severe impairment caused by plaintiff's shoulder tendinitis on the basis of Dr. Girzadas' findings alone. The ALJ had ample reason to "pick and choose" between different parts of Dr. Girzadas' record. Dr. Girzadas' findings with regard to plaintiff's back pain were well supported by the rest of the record, including the opinions of the treating physicians and the objective evidence. His findings with regard to plaintiff's shoulder tendinitis were not supported by the rest of the record, however. Plaintiff had never sought treatment for the shoulder pain, indicating that the impairment was not severe.

Furthermore, even if plaintiff has limitations on pushing and pulling, those limitations would have little effect on her ability to perform sedentary jobs identified by the vocational expert. See SSR 83-10 (a job is considered light if it "involves sitting but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work"). The ALJ reasonably declined to include limitations based on plaintiff's seizure disorder because plaintiff had received little treatment for it, EEG studies showed no evidence of a seizure disorder, and plaintiff admitted that the seizures caused her fatigue only two times a month. (R. 259.)

Finally, the ALJ did consider the combined effect of plaintiff's severe and non-severe impairments in accordance with 20 C.F.R. § 404.1523. The ALJ stated that plaintiff had severe back problems and non-severe bilateral tendinitis of the shoulders and a possible sleep disorder, but did not have a "combination of impairments" that met or equaled a listed impairment. (R. 24, #3.) This language demonstrates that the ALJ did consider the combined effects of plaintiff's impairments. See Nelson v. Bowen, 855 F.2d 503, 508 (7th Cir. 1988) (ALJ's statement that plaintiff's impairments "singly or combined" did not preclude work showed that he considered the combined effect of the impairments). In light of the forgoing discussion, the ALJ's conclusion was based upon substantial evidence and thus cannot be disturbed here.

III.    Medical Evidence Favorable to Plaintiff

Plaintiff next argues that the ALJ erred in not considering evidence favorable to her, including a report from Dr. McDonald, a chiropractor who treated plaintiff for 13 months, numerous reports from Dr. Schiappa, plaintiff's first treating orthopedic physician, and reports from the physical therapy sessions prescribed by Dr. Schiappa. Under the law of the Seventh Circuit, the ALJ is not required "to evaluate in writing every piece of testimony and evidence submitted." Zalewski v. Heckler, 760 F.2d 160, 166 (7th Cir. 1985). Court require only "a minimal level of articulation by the ALJ as to his assessment of the evidence . . . in cases in which considerable evidence is presented by the claimant". Id.

The ALJ met the minimal level articulation of his assessment of the evidence here, even though he did not mention Dr. McDonald's report at all. That report diagnosed plaintiff with severe degenerative arthritis of the lumbar spine and paravertebral muscle spasms, and states that "plaintiff will probably experience pain and discomfort for an extended period of time." (R. 65, 66.) The

medical doctors in this case provided sufficient basis from which the ALJ could assess plaintiff's limitations. Moreover, Dr. McDonald's report is entirely consistent with the reports submitted by the other doctors, and plaintiff makes no attempt to argue how the ALJ's decision would have been different had he considered the evidence. The ALJ found that plaintiff suffers from severe back impairments, including arthritis. The ALJ clearly understood that plaintiff would continue to "experience pain and discomfort," and accommodated that pain by limiting the work plaintiff could do to sedentary work. The same is true for Dr. Schiappa's reports. The ALJ did consider Dr. Schiappa's ultimate findings and conclusions, but did not mention all of his specific statements, including mention of severe pain, and that plaintiff "would have good days, but mostly bad days." However, the ALJ's opinion makes clear that he understood Dr. Schiappa's findings regarding plaintiff's pain. Again, the ALJ accommodated that pain by finding that plaintiff could perform only sedentary work. The ALJ was reasonable in concluding, based on the other evidence presented, that plaintiff's pain would not prevent her from performing the limited demands of sedentary work where she would have the option of sitting or standing.

IV.    Credibility Determinations

Plaintiff argues that the ALJ failed to consider the appropriate factors in assessing the credibility of her claims of debilitating pain. In assessing credibility, the ALJ must consider all of the evidence and must provide specific reasons for the credibility finding. See 20 C.F.R. § 404.1529(c); see also SSR 96-7p ("[W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."). Again, here the ALJ complied with

the Seventh Circuit's articulation requirements and with the regulations. The ALJ considered the record as a whole, including treating and nontreating physician records, objective medical evidence, plaintiff's treatment history, and plaintiff's own statements to physicians regarding her pain and the side effects of her medication, and concluded that plaintiff's subjective complaints were not supported by the record. The ALJ made the findings and articulations required by law, finding that plaintiff's complaints "were not born out by the evidence and of record and were out of proportion to the limitations observed clinically by the various consultative examiners." (R. 24.) Given Drs. Schiappa and Girazadas' findings that plaintiff could sit or stand for with only minor limitations, the ALJ's findings are amply supported by the record. Credibility determinations are left to the province of the ALJ, and this court finds no error in the ALJ's credibility determination. Herron v. Shalala, 19 F.3d 329, 335 (7th Cir.1994) (finding that a court will not upset ALJ's credibility determination on appeal unless they are "patently wrong" because the ALJ is in the best position to observe the witnesses).

## CONCLUSION

For the reasons stated, this court finds that there is substantial evidence in the record to support the Secretary's conclusion that plaintiff was capable of sedentary work. This court therefore affirms the ALJ's finding that plaintiff is not disabled and thus not eligible to receive social security disability insurance benefits. Plaintiff's motion for summary judgment is therefore DENIED, and

defendant's motion for summary judgment is GRANTED. This case is dismissed in its entirety. All pending motions are moot.

ENTER:

JAMES F. HOLDERMAN
United States District Judge

DATE: September 6, 2000